## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

ENRIQUETA A. MOORE, ET AL.                    CIVIL ACTION NO. 16-1463

VERSUS                                                    JUDGE S. MAURICE HICKS, JR.

STATE OF LOUISIANA, THROUGH         MAGISTRATE JUDGE MCCLUSKY
DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONS, ET AL.

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 106) filed by Defendants, the State of Louisiana, through the Louisiana Department of Public Safety and Corrections ("LDPSC"), and Jerry Goodwin (collectively the "Defendants"). Defendants submit that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. More specifically, they contend there was no violation of Kenneth M. Cotton, Jr.'s ("Cotton") Eighth Amendment rights and that Defendant Jerry Goodwin ("Goodwin") is entitled to qualified immunity. Defendants further ask the Court to decline to exercise supplemental jurisdiction over Plaintiffs' Louisiana state law tort claims. Plaintiffs Logan Guidry and Kenneth Cotton, III, the minor children of Cotton, oppose the Motion for Summary Judgment, arguing there are genuine issues of material fact preventing summary judgment as to the Eighth Amendment claims and that Goodwin is not entitled to qualified immunity. For the reasons set forth below, the Defendants' Motion for Summary Judgment is **GRANTED**. Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE** and their state law tort claims are **DISMISSED WITHOUT PREJUDICE**.

# BACKGROUND[1]

Plaintiffs allege Cotton's Eighth Amendment rights were violated when he was the victim of an offender-on-offender assault while incarcerated in a Louisiana correctional facility. On February 11, 2016, Anthony Tellis ("Tellis") and Cotton were housed in David Wade Correctional Center's ("DWCC") North Compound in the H2A dormitory. On February 12, 2016, Cotton was asleep in his bed when he was attacked by Tellis. Tellis attacked Cotton with a combination padlock in a laundry bag. Sergeant Jordan responded to stop the assault. Captain Finley entered H2A to stop the assault. Captain Finley and Sergeant Jordan restrained Tellis. Prior to the assault, Tellis did not notify any corrections staff that he had any prior confrontations or any issues with Cotton.

At 12:11 AM, Nurse Benson arrived in the dorm to give medical assistance. At 12:14 AM, Nurse Benson exited H2A with Cotton in a wheel chair to go to the North Infirmary. Nurse Benson's notes at 12:20 a.m. indicate that Cotton suffered head injuries with two lacerations to the left side of the head, from left forehead region to behind left ear. The cut to the left forehead was a gaping wound with profuse bleeding and measured approximately 10 cm wide by 25 cm long. The wound behind the left ear measured approximately 5 cm wide by 20 cm long and was also a deep gaping wound. Pressure was applied to the wounds. At 12:30 a.m., Dr. Fuller ordered Cotton be transported to the University Health System Emergency Room ("University Health"). Pafford EMS received a transport request at 12:52 a.m. Plaintiffs submit that during this delay, Cotton

---

[1] For the most part, the facts of this case are undisputed. Defendants submitted a Statement of Undisputed Facts listing 18 enumerated facts. See Record Document 106-2. Plaintiffs responded with a Traverse of Defendants' Statement of Uncontested Facts. See Record Document 110-6. Fifteen facts were undisputed. The remaining three facts were "true but incomplete." Id. Plaintiffs' explanation as to the "incomplete" facts has been included in the background section of the instant ruling.

was confused, in severe pain, vomiting, and lethargic.  See Record Document 110-6. Plaintiffs believe his condition deteriorated during this time.  See id.

Pafford EMS arrived at approximately 1:14 a.m., and took over the care and treatment of Cotton.  Pafford EMS arrived at University Health at 2:47 a.m., and care was provided by University Health staff.  On February 12, 2016, at 2:19 p.m., Dr. Jessica Wilden performed a craniotomy and evacuation of a subdural hematoma with the removal of fractured pieces of skull, followed by a cranioplasty using mesh.

On February 20, 2016, trauma staff at University Health examined Cotton.  They confirmed there was no cornea, pupillary, gag, pain, cough or brainstem reflexes.  Cotton was deemed clinically brain dead and removed from the ventilator.  His time of death is recorded as 8:15 p.m. on February 20, 2016.

Pursuant to DWCC policy, one padlock may be issued to an offender.  If an offender can afford to buy another padlock, the offender may purchase a second padlock.  However, the offender can only have up to two padlocks, i.e., one for each footlocker.  There have been a total of 16 offender-on-offender attacks at DWCC involving the use of a padlock from 2012 to the date of filing, i.e., January 2023.  This averages to 1.6 offender-on-offender attacks at DWCC per year involving the use of a padlock from the year of 2012 through January 2023.  There were no incidents in 2014, 2019, 2020, and 2022.  At the time of the filing of the instant motion, there had been no incidents in 2023.  There is no dispute that at the time of the assault on Cotton, Defendants were aware of offender-on-offender attacks at DWCC involving the use of a padlock as a weapon.

Plaintiffs filed the instant action alleging violations of the Eighth Amendment and Louisiana state tort law.  More specifically, Plaintiffs contend that Defendants failed to

protect Cotton from the substantial risk that an inmate would cause serious harm by attacking him with a padlock, failed to provide adequate medical care to Cotton, and failed to train medical staff and other employees to take appropriate action. Defendants have now filed the instant Motion for Summary Judgment, arguing they were not deliberately indifferent to Cotton's need for protection, Goodwin is entitled to qualified immunity, they were not deliberately indifferent to any medical need of Cotton, and the responding officers/employees were trained appropriately. See Record Document 106-3 at 10-26. Defendants further submit that Plaintiffs' state law tort claims should be dismissed without prejudice as the Court should decline to exercise its supplemental jurisdiction. See id. at 27. In response, Plaintiffs maintain there are genuine issues of material fact preventing summary judgment as to the Eighth Amendment claims and Defendant Goodwin is not entitled to qualified immunity. See Record Document 110 at 7-18. As to the state law tort claims, Plaintiffs agree that this Court should decline to exercise its supplemental jurisdiction if all federal claims are dismissed. See id. at 19.

## LAW AND ANALYSIS

### I.    Rule 56 Standard.

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." Deshotel v. Wal-Mart Louisiana, L.L.C., 850 F.3d 742, 745 (5th Cir. 2017); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be

4

believed, and all justifiable inferences are to be drawn in his favor.").  As such, the party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact as to issues critical to trail that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery.  See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).  Courts must deny the moving party's motion for summary judgment if the movant fails to meet this burden.  See id.

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  Id. (citing Celotex, 477 U.S. at 323).  In evaluating motions for summary judgment, courts must view all facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  There is no genuine issue for trial—and thus, a grant of summary judgment is warranted—when the record as a whole "could not lead a rational trier of fact to find for the moving party…."  Id.

## II.    Section 1983 and the Eighth Amendment.

Title 42, United States Code, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C.A. § 1983.  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."  Baker v. McCollan, 443 U.S. 137, 146, 99 S. Ct. 2689, 2695 (1979).

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Adames v. Perez, 331 F.3d 508, 512 (5th Cir. 2003). More specifically, "the Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other inmates." Id. Yet, prison officials are not required to thwart all inmate-on-inmate/offender-on-offender violence. See id. They "can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm." Id.

Prison officials are deliberately indifferent when they know of an "excessive risk to inmate health or safety" and disregard that risk. Id. A prison official "knows of" an excessive risk only if (1) he is aware of facts from which he could infer "that a substantial risk of serious harm exists" and (2) he in fact "draw[s] the inference." Id. "In other words, in order to be deliberately indifferent, a prison official must be subjectively aware of the risk." Id.

In the specific context of an inadequate medical attention claim, the facts of a case must "clearly evince" the prisoner's serious medical need and the prison officials' deliberate indifference to it. Hernandez v. Velasquez, 522 F.3d 556, 561 (5th Cir. 2008), citing Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985) ("The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants."). "Merely negligent diagnosis or treatment of a medical condition does not state a claim under the Eighth Amendment." Hernandez, 522 F.3d at 561. There must be deliberate indifference resulting in substantial harm. See id.

It is well settled under Section 1983 jurisprudence that supervisory officials cannot be held vicariously liable for their subordinates' actions. See Mouille v. City of Live Oak,

6

Tex., 977 F.2d 924, 929 (5th Cir. 1992), citing Monell v. Department of Social Services, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38 (1978).  A supervisory official not personally involved in the alleged unconstitutional acts is liable under Section 1983 only if:  (1) the supervisory official "failed to train or supervise the [subordinates] involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights."  Thompson v. Upshur Cnty., TX, 245 F.3d 447, 459 (5th Cir. 2001).

## III.    Qualified Immunity.

"Qualified immunity protects government officials from liability for damages when they violate the law, but nonetheless reasonably could have believed that they were acting lawfully."  Ramirez v. Killian, 113 F.4th 415, 421 (5th Cir. 2024).  The doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  Id.  "To overcome the defense, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  Id.  "Courts have flexibility as to the order in which they evaluate these two requirements."  Id. at 422, citing Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009).

For purposes of qualified immunity, a clearly established right is one whose contours are sufficiently clear enough that a reasonable official would understand that what he is doing violates that right.  See Johnson v. Johnson, 385 F.3d 503, 524 (5th Cir. 2004).  In addition to alleging the violation of a clearly established constitutional right, a plaintiff must also allege facts showing that the defendant's conduct was objectively

unreasonable in the light of the law established at the time of the incident.  See Heitschmidt v. City of Houston, 161 F.3d 834, 836–37 (5th Cir. 1998).

Often times, the merits of a plaintiff's constitutional claims must be addressed because they are inextricably intertwined with a key issue necessary to resolve the question of qualified immunity, i.e., whether there was a violation of a constitutional right. See Gibson v. Rich, 44 F.3d 274, 277 (5th Cir.1995) (holding government officials are entitled to qualified immunity from suit when performing discretionary functions unless their conduct violated statutory or constitutional rights, clearly established at the time of the alleged incident, of which a reasonable person would have known); see also Bruton v. Treon, No. 7:01-CV-075-R, 2002 WL 31255351, at *3 (N.D. Tex. Sept. 24, 2002), aff'd, 73 F. App'x 729 (5th Cir. 2003).  If a defendant's actions do not give rise to any issue of constitutional magnitude, then he is entitled to qualified immunity.  See Bruton, 2002 WL 31255351, at *3.

## IV.    Analysis.

### A.    Failure to Protect.

Plaintiffs allege that the padlocks distributed to prisoners at DWCC to secure their personal belongings can be used as dangerous weapons thereby putting other prisoners at risk of being attacked with those padlocks.  Plaintiffs further assert that prison officials had prior knowledge that padlocks could be used in this manner.  Such prior knowledge purportedly put Defendants on notice that padlocks were being used as weapons, posed a substantial risk of harm, and Defendants responded with deliberate indifference, all amounting to a violation of Cotton's Eighth Amendment right against subjection to cruel and unusual punishment.  Plaintiffs focus on the generalized threat of harm from the use

of a padlock as a weapon, not a particular threat of harm from a certain inmate.  Plaintiffs further concentrate on an alleged one-year spike, i.e., four padlock assaults in 2015, in offender-on-offender/inmate-on-inmate padlock assaults just prior to Cotton's attack, which occurred in February 2016.  See Record Document 110 at 8.  They submit that Defendants' failure to respond appropriately to the one-year spike was deliberate indifference and a violation of Cotton's Eighth Amendment rights.

Goodwin, who has been Warden at DWCC since June 16, 2008, submitted an affidavit in support of the defense motion.  He explained that the LDPSC and DWCC have a policy of allowing padlocks and footlockers as a means of securing their personal belongings.  See Record Document 106-4 at ¶ 5.  He explained that issuing padlocks was a reasonable means of controlling theft – a common occurrence leading to violence between offenders – and thereby reducing violent confrontations among offenders.  See id. at ¶ 6.  While there is no specific written policy regarding the issuance of padlocks, they are listed as DWCC allowable property.  See id. at ¶ 7.  Warden Goodwin further attested:

> The practice of allowing offenders padlocks to secure their personal property is common in penal institutions throughout the United States, for both the State and Federal Institutions.
>
> I am aware that offenders, on occasion, may use padlocks as weapons to assault other offenders.
>
> In my experience, padlocks have been used as a weapon on a small number of offender-on-offender assaults.
>
> I have reviewed DWCC records of offender-on-offender assaults where a padlock was used as a weapon going back ten full years from 2012 through 2022, and I found that there were 16 incidents, including the subject assault – an average of 1.6 per year.  Notably, there were zero assaults in 2014, 2019, 2020, 2022, and none to-date in 2023.

> In my experience, issuing padlocks to offenders is a common corrections practice in Louisiana, other states, and the federal system, and is a reasonable way to give offenders a means to secure their belongings. Attached to this affidavit are copies of the Commissary lists for: (1) FCI Waseca, Minnesota; (2) F.C.C. Pollock; (3) FDC Houston; (4) FCI/FDC Tallahassee; (5) Commissary Price List in Texas; (6) Commissary Price List in Mississippi; and (7) FCC Oakdale, which all show padlocks as permissible items.

Id. at ¶¶ 9-13.   Goodwin stated that in his opinion, "the benefit of issuing padlocks outweighs the risk that the padlock will be used as a weapon."  Id. at ¶ 13.

Defendants have also presented the affidavit and report of George J. Armbruster ("Armbruster"), an expert in corrections issues, corrections use of force, corrections procedures and corrections training.  See Record Documents 106-16 and 106-17. Armbruster is "of the opinion that the actions of the members of the DWCC in the handling of [the Cotton incident] fall within the generally accepted guidelines of the law enforcement and corrections profession."  Record Document 106-17 at 2.  Armbruster reviewed the policies of DWCC which were pertinent to the Cotton incident and found that they "were the type of polic[ies] generally seen within the law enforcement and corrections profession within the State of Louisiana."  Id.  DWCC's policies are similar to those outlined by the American Correctional Association ("ACA"), an authoritative source, and DWCC has obtained and maintained compliance through the ACA accreditation process. See id.  While the ACA does not provide guidance concerning padlocks for offender lockers, Armbruster stated that "it is well recognized that offender property needs to be secure from theft by other offenders" because "to allow rampant theft of offender property would be detrimental to a secure corrections environment."  Id.

In Francisco v. Hebert, No. 05-1850, 2007 WL 1805772, at *1 (W.D. LA. June 21, 2007), the Western District of Louisiana considered a claim that a corrections policy of

issuing padlocks to inmates for purposes of securing their personal effects constituted deliberate indifference when officials were aware of prior instances of offender-on-offender violence where padlocks were used as weapons.  The plaintiff cited a previous complaint filed in the Western District and argued that he was subject to a substantial risk of harm of which the Sheriff was aware and that the Sheriff's continued sale of padlocks in the jail was in deliberate indifference to his safety.  See id. at *7.  The court rejected the claim, reasoning:

> [T]he Court finds that plaintiff has failed to carry his summary judgment burden. . . .  [A]ssuming that a padlock was used, while also considering plaintiff's arguments that the jail guards failed to adequately respond to fights in the cell areas, the Court finds that plaintiff's submissions are inadequate to raise a genuine issue of fact that Sheriff Hebert's policies were constitutionally inadequate. . . .  [P]laintiff's assertion that Sheriff Hebert's continued sale of padlocks following the receipt of the Sanchez Complaint amounts to deliberate indifference fails to consider that the padlock "weapon" at issue is not simply a weapon but serves the primary and necessary function of securing inmates' private property. Additionally, plaintiffs argument fails to recognize that inmate possession of padlocks is controlled to the extent that Sheriff Hebert has required that locks be obtained only through the jail commissary and disallows all other locks as contraband.
>
> . . .
>
> Based on the evidence submitted, and considering the record as a whole, while recognizing that "[d]eliberate indifference is an extremely high standard to meet," Domino v. Texas Dept. of Criminal Justice, 239 F.3d 752, 756 (5th Cir.2001), the Court finds that plaintiff has failed to raise a genuine issue of fact that he faced an excessive risk of attack by or with a padlock to which Sheriff Hebert responded with deliberate indifference.

Id. at *7–8.

Much like the court in Francisco, the First Circuit has held that prison officials did not violate the Eighth Amendment by failing to discontinue the practice of providing padlocks to inmates.  See Lakin v. Barnhart, 758 F.3d 66 (1st Cir. 2014).  In Lakin, the

plaintiffs alleged that the defendants' failure to take adequate measures to protect inmates from padlock assaults violated their Eighth Amendment right.  See id. at 69. "Specifically, [the plaintiffs] alleged that defendant prison officials were aware of the use of padlocks as weapons in inmate assaults on each other, but despite that knowledge, continued to allow inmates to possess such items and continued to disburse such items to inmates entering prison."  Id.  The prison at issue had "no more than two reported padlock assaults annually during [a] six-year time period, with the notable exception of 2010, when six were reported."  Id. at 68.  The record did not explain a spike in general violence at the prison in 2012 or the six padlock assaults in 2010.  See id.  Prison officials in Lakin submitted that "providing padlocks actually lowers the level of violence by reducing theft, which often precipitates inmate conflict."  Id.  The First Circuit held:

> This Circuit has not yet had occasion to attempt precision in explaining when the risk of violence among inmates is sufficiently "substantial" . . . .  It suffices, rather, to say that, wherever the line between substantial and insubstantial risks may lie, the risk as described here falls well within the zone of those too insubstantial for an Eighth Amendment claim. As already recounted, the annual occurrences of padlock assaults at the Prison have generally been few, both in absolute number and as a percentage of the total inmate violence. There were only six such assaults even at the height of disorder, in 2010, and the numbers quickly receded to their norm of one or two annually. To be sure, one assault, of any sort, is unacceptable, and there is no dispute that these assaults caused Lakin and Landry serious harm. But we cannot say that a small number of assaults involving the use of a particular prison-issued item, without more, is sufficient to sustain the conclusion that providing the item without restriction created "conditions posing a substantial risk of serious harm" rising to the level of constitutional violation.

> . . .

> To be clear, we do not suggest that there is some freestanding, numerical threshold . . . for the level of violence among inmates that is necessary for its risk to be considered "substantial" . . . .  But not every risk carries an inherent threat at a substantial level, or of severity beyond the norms, and here the only record evidence Lakin and Landry offer to suggest

that the risk of padlock assaults was "substantial" is the relatively low frequency with which they occurred at the Prison during the period leading up to the assaults they suffered. This, standing alone, does not create a genuine issue of material fact as to whether the risk was sufficiently substantial to support an Eighth Amendment claim . . . .

Finally, because the district court was on firm ground in finding no potential for a reasonable jury to determine that defendants violated Landry and Lakin's Eighth Amendment rights, we conclude that the trial court likewise correctly held that appellees were entitled to qualified immunity.

Id. at 71-72.

"Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259 (1987).  When a prison policy or regulation "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. at 2261.  The Supreme Court believed this standard was necessary if prison administrators, and not courts, were to make the arduous judgments concerning institutional operations.   See id.   The Court further reasoned:

Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

Id., 107 S.Ct. at 2262.

Here, there is no dispute that Warden Goodwin was aware, prior to the assault on Cotton, that offenders used padlocks as weapons in assaulting other offenders.  Yet, such assaults were infrequent and averaged 1.6 per year.  Even considering the one-year spike in 2015 urged by Plaintiffs, the Court does not believe the summary judgment record supports a finding that the allowance of padlocks – in and of itself – created a substantial risk of harm to the offender population at DWCC sufficient to show deliberate indifference to an "objectively intolerable risk of harm."  Farmer v. Brennan, 511 U.S. 825, 846, 114 S. Ct. 1970, 1983 (1994).  Inmate possession of padlocks was controlled at DWCC.  See Record Document 106-13 at 32.  Only one padlock was issued to an offender.  See id.  If an offender could afford to buy another, he could purchase another padlock.  See id.  Yet, the offender could only have up to two padlocks, one for each footlocker.  See id. Moreover, Goodwin has amply explained the legitimate penological interest in issuing and allowing padlocks at DWCC, i.e., providing padlocks lowers inmate violence by reducing theft, which often causes inmate conflict.  This penological interest was also reiterated by Armbruster and in the cited case law.  The summary judgment record further demonstrates that the practice of allowing offenders padlocks to secure their personal belongings is common in many state and federal penal institutions throughout the United States.  The risk in this matter was not sufficiently substantial to support an Eighth Amendment claim.  Plaintiffs' failure to protect claim does not survive summary judgment.

As discussed *supra*, this Court has found that Goodwin's actions regarding DWCC's padlock policy did not give rise to any issue of constitutional magnitude.  Thus, the Court finds that Goodwin is entitled to qualified immunity from suit as to the Eighth

Amendment failure to protect claim.  See Gibson, 44 F.3d at 277; Bruton, 2002 WL 31255351, at *3.

**B.    Medical Care.**

Plaintiffs allege that the medical attention that Cotton received was inadequate and specifically point to refusal of medical care and untimely medical care.  Plaintiffs focus the majority of their attention on "the 22-minute delay in . . . Cotton's medical treatment." Record Document 110 at 16.[2]  To survive summary judgment for these claims, "the facts . . . must clearly evince the prisoner's serious medical need and the prison officials' deliberate indifference to it."  Hernandez, 522 F.3d at 561.  Stated another way, the facts must clearly evince "wanton actions on the part of the defendants."  Johnson, 759 F.2d at 1238.  "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997).  Negligence in diagnosis and/or treatment is insufficient to establish deliberate indifference.  See Hernandez, 522 F.3d at 561.

Defendants have submitted the expert report of Dr. Thomas D. Fowlkes, M.D. ("Dr. Fowlkes"), a correctional medicine physician with approximately 24 years of experience in delivering primary care in a correctional setting.  In his opinion, the medical care provided to Cotton while he was incarcerated at DWCC on February 12, 2016 was entirely reasonable, appropriate and well within the standard of care.  See Record Document 106-15 at 7.  Dr. Fowlkes considered the response and transport time and stated that the response to the medical emergency by Nurse Benson was prompt, appropriate and well

---

[2] Plaintiffs submit that Dr. Fuller ordered Nurse Benson to have Cotton transported by ambulance for emergency medical intervention at 12:30 a.m., but Pafford EMS did not receive a transport request until 12:52 a.m.  See Record Document 110 at 16; see also Record Document 106-15 at 3-4.

exceeded the standard of care.  <u>See</u> Record Document 106-15 at 8.  He characterized her actions and documentation as "exemplary" and specifically noted:

a.    She promptly transported Mr. Cotton to the infirmary since he was awake and talking. This would provide her with a better lighted and equipped space in which to further assess his injuries.

b.    Within just a very few minutes she determined that Mr. Cotton required referral to a hospital for additional treatment not available at DWCC.

c.    She promptly called the on-call provider and got orders to send Mr. Cotton to the hospital by ambulance.

d.    She notified the security personnel of the need for an emergency transfer to the hospital.

e.    She continued to assess and treat Mr. Cotton until the EMS personnel arrived and took over care of Mr. Cotton.

f.    She continued to assess and treat Mr. Cotton until the EMS personnel arrived and took over care of Mr. Cotton.

<u>Id.</u> at 8-9.  Dr. Fowlkes further explained that "the specific timing of where the ambulance responds from, how long it takes them to arrive, how long they remain on the scene treating the patient and how long the transport takes are not within Nurse Benson's nor DWCC's control.  Nevertheless, the times in this case do not appear to be excessive or unusual."  <u>Id.</u> at 9.

The summary judgment evidence demonstrates that DWCC medical staff, including Nurse Benson, responded in a timely manner to Cotton's medical emergency. They performed assessments, rendered medical services, and transferred Cotton to a trauma center for additional treatment.  The medical staff were aware of the serious harm arising from Cotton's injuries and clearly drew the appropriate inference regarding the gravity of the harm.  Their response demonstrated the opposite of deliberate indifference.

16

There is nothing in the summary judgment record indicating they intended any harm to occur or that their actions encompassed an unnecessary and wanton infliction of pain repugnant to the conscience of mankind.   Thus, Plaintiffs' inadequate and/or untimely medical care claims do not survive summary judgment.

      **C.**    **Failure to Train.**

      In their original Petition, Plaintiffs allege Defendants failed "to adequately train the employees regarding the supervision of prisoners."  Record Document 1-2 at ¶ 10(3).[3] In response to the defense motion, Plaintiffs now submit that Defendants failed to train medical staff to implement the doctor's orders in a timely manner.   They point to "undisputed evidence that [Nurse] Benson or other staff at DWCC waited 22 minutes before calling for an ambulance despite medical orders to do so."  Record Document 110 at 18.  Additionally, Plaintiffs maintain that there are genuine issues of fact and law as to whether Goodwin and his staff engaged in deliberate and reasoned policy making in response to a one-year spike in padlock attacks at DWCC.  According to Plaintiffs, "these two legal and factual issues alone raise genuine issue[s] of material fact and law as to whether Defendants' employees were trained properly."  Id.

      It appears that Plaintiffs have expanded the scope of their failure to train claim as set forth in their original Petition.   Notwithstanding, the Court will address both contentions.  Again, as previously referenced, a supervisory official such as Goodwin not personally involved in the alleged unconstitutional acts is liable under Section 1983 only if he:  (1) "failed to train or supervise the [subordinates] involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of

---

[3] While Plaintiffs filed a First Amending and Supplemental Complaint (Record Document 15), it did not amend the failure to train allegations.

the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." Thompson, 245 F.3d at 459.

As discussed *supra*, Defendants have submitted the expert report of Dr. Fowlkes. See Record Document 106-15.  He considered and discussed the promptness of the care provided by Nurse Benson and other DWCC medical staff.  Dr. Fowlkes opined that "the response to this medical emergency by Nurse Benson was exemplary, prompt, appropriate and well exceeded the standard of care.  See id.  at 8.  Moreover, the summary judgment record simply does not include evidence that would satisfy a failure to train claim as to the actions of Nurse Benson or other DWCC staff in relation to any alleged delay in calling for an ambulance.  Nothing in the record amounts to deliberate indifference, which in a failure to train context requires Plaintiffs to demonstrate "a pattern of similar constitutional violations by untrained employees." Connick v. Thompson, 563 U.S. 51, 62, 131 S.Ct. 1350, 1360 (2011) (quotation omitted).  Here, Plaintiffs do not allege or present evidence of the requisite pattern of constitutional violations. Instead, they only describe Cotton's experience.  Thus, the failure to train claim relating to any alleged delay in calling for an ambulance does not survive summary judgment.

Plaintiffs further allege that Defendants failed to adequately train the employees regarding the supervision of prisoners and seem to specifically tie this allegation to DWCC's supposed lack of response to the one-year spike in padlock attacks at DWCC. As to this claim, Defendants refer to the Armbruster report.  See Record Document 106-17.  Armbruster stated that "[b]ased on the information available at the time of this incident these officers responded in a manner which is consistent with proper DWCC policy and training."  See id.  at 2.  All of the officers had successfully completed all training

requirements of the State of Louisiana Peace Officer Standards and Training Council ("POST"), were State certified at the time of this incident, and had completed all required mandatory training needed for POST accreditation/compliance.  See id.

Moreover, Plaintiffs have not come forward with facts clearly evincing wanton actions on the part of Defendants.  Deliberate indifference requires wantonness, "not inadvertence or error in good faith." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324 (1991).  Goodwin has explained the rationale behind the DWCC padlock policy. The record indicates that the average of offender-on-offender assaults involving the use of a padlock as a weapon was 1.6 per year. There is no record evidence demonstrating that prison officials were aware of any problems between Cotton and Tellis.  Plaintiffs have simply failed to provide direct evidence – as required by the summary judgment legal standard – that DWCC staff deliberately intended to cause Cotton harm; and deliberate indifference can be inferred only upon a showing of "subjective recklessness" in the criminal sense.  Norton v. Dimizana, 122 F.3d 286, 291 (5th Cir.1997).  Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." Thompson, 245 F.3d at 459. Accordingly, the Court finds that Plaintiffs have failed to raise a genuine issue of fact that Defendants failed to adequately train the employees regarding the supervision of prisoners.

### D.    Louisiana State Law Tort Claims.

Plaintiffs allege both negligent and intentional torts under Louisiana state law. Although 28 U.S.C. § 1367 confers supplemental jurisdiction over such state law claims, the assertion of supplemental jurisdiction may be declined if all claims over which the

Court has original jurisdiction are dismissed. <u>See</u> 28 U.S.C. § 1367(3).  "When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. However, the dismissal of the pendent claims should expressly be without prejudice so that the plaintiff may re-file his claims in the appropriate state court."  <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 246 (5th Cir.1999).

Here, the entirety of Plaintiffs' federal claims were dismissed by this ruling.  The Court will not have original jurisdiction over their remaining state law claims.  Plaintiffs agree that this Court should decline to exercise its supplemental jurisdiction in such instance.  <u>See</u> Record Document 110 at 19.  Accordingly, the Court will dismiss Plaintiffs' state law claims without prejudice.

## CONCLUSION

Based on the foregoing analysis, the Court finds there was no violation of Cotton's Eighth Amendment rights.  Accordingly, the Defendants' Motion for Summary Judgment is **GRANTED**.  Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE** and Plaintiffs' Louisiana state law tort claims are **DISMISSED WITHOUT PREJUDICE**, as the Court declines to exercise supplemental jurisdiction over such claims.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 1st day of November, 2024.

_____
United States District Judge